UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KIMBERLY ELIZABETH BRYNILDSEN,

    Plaintiff,

v.                                                    Case No.  3:19-cv-538-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

    Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his[2] application for supplemental security income ("SSI"). Plaintiff filed his application for SSI on July 1, 2017, alleging a disability onset date of January 10, 2016.[3]  (Tr. 26, 74-75.)  The claim was denied initially and on reconsideration.  A hearing was held before the assigned Administrative Law Judge ("ALJ") on November 8, 2018, at which Plaintiff was represented by a non-attorney representative.  (Tr. 47-68.)  The ALJ issued an unfavorable decision on

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 21.)

[2] As noted in Plaintiff's brief, although the medical records use both male and female pronouns, "Plaintiff is a transgender individual who identifies as male, therefore[,] all pronouns used will be male."  (Doc. 26 at 1.)

[3] The relevant period for SSI is the month in which Plaintiff filed his application (July 2017) through the date of the ALJ's decision (November 29, 2018).  (Tr. 26.)

November 29, 2018, finding Plaintiff not disabled from July 1, 2017, the date the SSI application was filed, through the date of the decision.  (Tr. 26-39.)

Plaintiff is appealing the Commissioner's final decision that he was not disabled since July 1, 2017.  Plaintiff has exhausted his available administrative remedies and the case is properly before the Court.  (Tr. 1-6.)  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I.   Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v.*

*Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Discussion

### A. The Parties' Arguments

Plaintiff raises one issue on appeal, arguing that the ALJ erred by failing to address his gender dysphoria/gender identity disorder[4] and related limitations in his decision, including at step two of the sequential evaluation process[5] and in determining his residual functional capacity ("RFC"). (Doc. 26 at 15.)

---

[4] The Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5) lists gender dysphoria as a diagnosis which "is intended to be more descriptive than the one that was previously used, gender identity disorder." *See Gender Dysphoria*, https://www.mayoclinic.org/diseases-conditions/gender-dysphoria/symptoms-causes/syc-20475255 (last visited October 28, 2020). "The term gender dysphoria focuses on one's discomfort as the problem, rather than identity. A diagnosis of gender dysphoria was created to help people get access to necessary health care and effective treatment." *Id.* Complications involving gender dysphoria may interfere with daily activities, as follows:

> Preoccupation with being of another gender than the one assigned often interferes with daily activities. People experiencing gender dysphoria might refuse to go to school, due to pressure to dress in a way that [is] associated with their sex or out of fear of being harassed or teased. Gender dysphoria can also impair the ability to function at school or at work, resulting in school dropout or unemployment. Relationship difficulties are common. Anxiety, depression, self-harm, eating disorders, substance abuse and other problems can occur.
> . . .
> Adolescents and adults with gender dysphoria before gender reassignment might be at risk of suicidal ideation, suicide attempts and suicide. After gender reassignment, suicide risk might continue.

*Id.*

[5] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).

3

Specifically, Plaintiff argues that despite evidence in the record demonstrating "limitations arising from his diagnosed gender identity disorder," (*id.* at 6-15), the ALJ failed to address his "gender identity disorder at step 2, making no findings as to whether it is even a medically determinable impairment, no less a 'severe impairment' resulting in work-related limitations" (*id.* at 15).  Thus, according to Plaintiff, "this created a 'ripple effect of errors'" as the ALJ's discussion provided "no indication he even considered this impairment when formulating the RFC and [in] considering the effects of Plaintiff's limitations on his ability to work." (*Id.* at 16.)

Moreover, Plaintiff contends that this error was not harmless as his "ability to handle basic workplace stress, interactions with others and change is clearly impacted by his gender identity disorder." (*Id.* at 17.)  Plaintiff notes that although "the ALJ provided for some mental limitations in the RFC," the ALJ failed to discuss "the impact that Plaintiff's gender identity disorder would have, resulting in an RFC analysis/finding that does not adequately address all of Plaintiff's limitations and impairments." (*Id.*)  According to Plaintiff, "the ALJ's error is in not providing any rationale at all for review; the ALJ's failure to provide any explanation or discussion of the very prevalent impairment precludes review as to whether the RFC finding is supported by substantial evidence." (*Id.*)

Defendant responds that substantial evidence supports the ALJ's findings at step two and that "Plaintiff failed to prove that his alleged gender identity disorder, whether severe or not severe, caused additional limitations." (Doc. 27

4

at 5.)  Defendant also counters that the ALJ was not required to identify every severe impairment at step two, and that while Plaintiff's medical records indicate that he was diagnosed with gender identity disorder (Tr. 377), "a diagnosis does not establish the existence of a severe impairment."  (*Id.* at 6-7.)  Defendant further contends that the ALJ properly evaluated the evidence, including Plaintiff's mental health complaints, and that the ALJ's findings were supported by substantial evidence.  (*Id.* at 7-10.)  According to Defendant, "Plaintiff failed to show that he had a separate and distinct severe impairment of gender identity disorder."  (*Id.* at 10.)  The Court agrees with Plaintiff.

### B.     Applicable Law

On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence for claims filed on or after March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5444-01, 2017 WL 168819 (Jan. 1, 2017); *see also* 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017) (amending and correcting the final rules).  Because Plaintiff filed his application for SSI after that date, the undersigned notes that the revised rules apply to the ALJ's decision.  However, as Defendant points out, while "the revised regulations applied to this claim," Plaintiff "did not raise any issue related to the revised regulations."  (*See* Doc. 27 at 5 (citing, *inter alia*, *Access Now Inc. v. SW Airlines*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")).)

### C.     The ALJ's Decision

At step two of the five-step sequential evaluation process, the ALJ found that Plaintiff had the following severe impairments: a disorder of the spine, psoriasis, an ankle impairment, a seizure disorder, obesity, an affective disorder, an anxiety disorder, and a trauma-related disorder (post-traumatic stress disorder ("PTSD")).  (Tr. 28.)  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments.[6]  (Tr. 28-31.)  The ALJ then found that, through the date of the decision, Plaintiff had the RFC to perform light work, as defined pursuant to 20 C.F.R. § 416.967(b), but with the following limitations:

> [The claimant] needs to avoid ladders or unprotected heights; needs to avoid the operation of heavy, moving machinery; needs a low-stress work environment, meaning no production line; needs simple tasks; needs to avoid contact with the public; can occasionally bend, crouch, kneel, or stoop; needs to avoid squatting or crawling; needs to avoid the push/pull of arm controls; and needs to avoid the operation of foot controls.

(Tr. 31.)  In making this RFC determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements concerning the intensity,

---

[6] The ALJ considered the listings under sections 1.00 (musculoskeletal disorders), 8.00 (skin disorders), and 11.00 (neurological disorders).  (Tr. 28.)  The ALJ also found that Plaintiff's "mental impairments, considered singly and in combination," did not meet or medically equal the criteria of listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma-related and stressor-related disorders).  (Tr. 29.)

persistence and limiting effects of th[e] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 32.)

In making these findings, the ALJ considered Plaintiff's statements and testimony,[7] the objective medical evidence, as well as the opinions of treating, examining, and non-examining sources. (Tr. 32-37.) The ALJ summarized Plaintiff's hearing testimony as follows:

> [T]he claimant testified that [he] was born on February 16, 1996, and is 22 years old. [He] indicated that [he] was 5'1" tall, weighs 236 pounds, and is right-handed. The claimant testified that [he] has never worked, and [he] noted that the last time [he] looked for a job was in 2016. The claimant stated that [he] went to [his] second year of high school, but dropped out in the middle of the year. Although [he] was not classified as being in special education, [he] was placed in classes for kids that had trouble catching up. The claimant stated that [he] missed a lot of school because [he] spent most of the time in hospitals. After [he] left high school, [he] tried online school; however, that did not work out either due to technical issues and[/or] teachers giving [him] a hard time. The claimant indicated that, when [he] was in school, [he] kept to [himself] because other people harassed [him] and did terrible things to [him].
> . . .
> The claimant stated that [he] does not currently take prescription medications because [he] does not have insurance and cannot afford medications. [He] has not applied for a Shands card.

(Tr. 31-32.) The ALJ also noted that Plaintiff reported that he spent all of his time at home; did as much housework as he could, including laundry; had not cooked in a long time, but could make quick meals and could wash a single bowl; could

---

[7] According to the ALJ, Plaintiff alleged "an inability to work due to anxiety, depression, severe skin conditions with open wounds, PTSD, a history of a left ankle fracture with residuals, a back impairment, a seizure disorder, fainting spells, and *gender dysphoria* (Exhibit B1E)." (Tr. 31 (emphasis added).) This is the only mention of gender dysphoria in the ALJ's decision.

7

not use the vacuum cleaner because it was too loud, but he could sweep; and he could not take out the trash or do yardwork. (Tr. 32.) According to the ALJ, Plaintiff also testified that he went out to eat every three weeks when he did grocery shopping, but was unable to put groceries away because he would be too tired "and everything hurt[]." (*Id.*) Plaintiff also stated he had difficulty reading books, but used the computer to do research, listen to music and the radio, look at pictures, and draw. (*Id.*) The ALJ also indicated that Plaintiff stated that his hobbies included playing the piano and writing music and stories; he visited his friend of nine years every couple of months, but alleged he did not really have any other friends; he could not "drive because of panic attacks that take on the form of seizures"; and he performed personal care independently. (*Id.*)

>The ALJ then summarized the medical evidence as follows:
>
>The medical evidence of record establishes that the claimant had a history of affective, anxiety, and trauma-related disorders for which [he] has received treatment. Although the claimant exhibited some extreme examples of abhorrent behavior as a child [], there are not examples of such behavior during the period at issue, which began with [the] protective filing date of July 1, 2017. Since that time, the claimant received treatment at Azalea Health for a short period of time []. Although [he] received counseling there, numerous treatment records indicate that [he] was not taking any psychotropic medications . . . . Furthermore, [his] counseling records do not contain any objective findings, but rather include only subjective complaints and treatment recommendations . . . . The claimant's counselor, George Deegan, LCSW, assessed the claimant's symptoms as being of moderate severity . . . . On multiple occasions in July 2017, the claimant reported that [he] was excited to be attending the COSPLAY (costume convention) in Tampa with [his] best friend . . . . Emergency room records from late 2017 and

8

> early 2018 indicate that [he] reported taking Celexa, Vistaril, and Trazodone . . . .
>
> In February 2018, [he] was hospitalized on two occasions due to depression and suicidal ideation; however, [he] acknowledged not taking [his] medication because [he] was in the process of changing psychiatrists . . . . [His] symptoms quickly stabilized and improved with resumption of medications, and three days later, [he] requested to be discharged because [his] mother was ill and needed assistance. The claimant's discharge mental status examination was benign except for a disheveled appearance and a flat affect. In March 2018, the claimant was hospitalized under the Baker Act due to suicidal ideation after [he] took an unknown amount of Luvox []. However, [he] later denied any recollection of this, denied suicidal ideation, and stated [he] had never been prescribed Luvox. At discharge the next day, [his] mental status examination was relatively benign, and [he] was advised to resume outpatient therapy.
>
> Furthermore, the findings of the psychological consultative examiner, Dr. Kirkendall, in September 2017 are inconsistent with the claimant's allegations []. His mental status examination revealed poor grooming, [] depressed affect, and dysthymic mood; however, the claimant exhibited cooperative behavior, adequate social skills, appropriate dress, and appropriate eye contact. [The claimant's] expressive and receptive language skills were adequate, [his] thought processes were coherent and goal-directed, and [his] attention, concentration, and recent and remote memory were intact. The findings of the psychological consultative examiner, Dr. Fisher, in August 2018 are also inconsistent with the claimant's allegations []. These findings include good immediate memory and short delayed recall, poor long delayed recall, fair remote memory; good fund of information; cordial and cooperative behavior despite a depressed mood; intact attention and concentration; poor personal hygiene and inappropriate dress; and good insight and judgment [].
>
> Significantly, when seen for physical complaints, the claimant was noted to be anxious at times, but [] was generally pleasant and cooperative with good eye contact . . . .

(Tr. 32-33.)

9

The ALJ concluded that the medical "records show[ed] that the claimant's symptoms were stable and were no more than moderate in nature when [he] took [his] medication as prescribed." (Tr. 33.) The ALJ noted that he had "accounted for the claimant's affective, anxiety, and trauma-related disorders by limiting [him] to a low-stress environment, meaning no production line; simple tasks; and no contact with the public." (*Id.*)

With respect to Plaintiff's physical impairments, the ALJ found that musculoskeletal and neurological findings were generally normal, including normal gait, station, strength, sensation, and coordination, and had "accounted for these impairments by limiting the claimant to light work" with additional limitations. (Tr. 34.) The ALJ also assessed Plaintiff's obesity, psoriasis, and seizure disorder, finding that these conditions did not preclude Plaintiff from performing the range of light work with limitations as identified in the RFC. (Tr. 35.)

In making the RFC determination, the ALJ also evaluated, *inter alia*, the "medical opinions and prior administrative medical findings," as follows:

> On September 28, 2017, Darrin Kirkendall, Ph.D., a consultative psychological examiner, opined that the claimant had no limitation in [his] ability to follow or understand simple directions and instructions; perform simple tasks independently; maintain attention and concentration; and make appropriate decisions. He opined that [the claimant] was moderately limited in [his] ability to maintain a regular schedule; learn new tasks; and perform complex tasks independently[;] and he opined that [the claimant] [was] markedly limited in [his] ability to relate adequately with others and appropriately deal with stress.

(Tr. 36.) The ALJ found this opinion to be persuasive "except for the marked limitations" and noted that "[a]lthough the claimant should not work around the public, marked limitations in dealing with coworkers and supervisors [did] not appear to be supported by the record." (*Id.*) The ALJ found the remainder of the opinion to be persuasive, reasoning that:

> [it] is supported by [the claimant's] relatively benign mental status examination findings when [he] was taking [his] medication as prescribed. . . . It is also supported by [his] activities of daily living, which include cooking, drawing, listening to music, writing stories and music, taking care of [his] cat and dog, skyping with friends, playing video games, researching things on the computer, playing [the] keyboard/piano, having regular contact with friends and family by phone, and traveling to Tampa to go to a costume convention with a friend . . . .

(*Id.*)

Next, the ALJ assessed the October 10, 2017 opinion of Heather Hernandez, Ph.D., a State agency psychological consultant, that Plaintiff could perform simple, routine tasks. (*Id.*) The ALJ found the opinion persuasive and explained as follows:

> It is supported by the claimant's relatively benign mental status examination findings when [he] was taking [his] medication as prescribed. These include intact memory, attention, and concentration; adequate fund of knowledge; and fair insight and judgment . . . . It is also supported by [his] activities of daily living . . . .

(*Id.*) Similarly, the ALJ found the December 28, 2017 opinion of Eric Wiener, Ph.D., a State agency psychological consultant, that Plaintiff could perform simple, routine tasks, to be persuasive. (*Id.*) The ALJ explained that the opinion

11

was "supported by the claimant's relatively benign mental status examination findings when [he] was taking [his] medication as prescribed," including "intact memory, attention, and concentration; adequate fund of knowledge; and fair insight and judgment." (*Id.*) The ALJ determined that Dr. Wiener's opinion was also supported by Plaintiff's activities of daily living. (*Id.*)

The ALJ also found the August 17, 2018 opinion of Rebecca Fisher, Psy.D., a consultative psychological examiner, to be persuasive. (Tr. 37.) Dr. Fisher opined that:

> [T]he claimant would have no limitation in [his] ability to understand and remember simple or detailed instructions; a moderate limitation in [his] ability to sustain concentration, persistence, and pace for detailed tasks; a moderate limitation in [his] ability to interact socially; and a marked limitation in [his] ability to adapt to the routine stressors changes [sic] of a general work environment (Exhibit 15F).

(*Id.*) The ALJ reasoned that Dr. Fisher's opinion was supported by Plaintiff's "mental status examination findings, which showed that despite a depressed mood and flat affect at times, the claimant generally exhibited cooperative behavior, adequate social skills, and appropriate eye contact during [] examinations . . . ." (*Id.*) Moreover, the ALJ noted that Plaintiff "reported having friends and family with whom [he] maintains regular contact" and that "when taking [his] medication as prescribed, the claimant had intact memory, attention, and concentration; adequate fund of knowledge; and fair insight and judgment . . . ." (*Id.*) The ALJ also found that Plaintiff's activities of daily living supported Dr. Fisher's opinion. (*Id.*) In sum, the ALJ found that the RFC assessment was

12

"supported by the minimal objective findings related to [the claimant's] physical impairments, the claimant's benign mental status examination findings when taking [his] medication as prescribed, and by [his] activities of daily living." (*Id.*)

Then, at step four of the sequential evaluation process, the ALJ determined that Plaintiff had no past relevant work. (*Id.*) At step five, considering Plaintiff's age,[8] education,[9] work experience, and RFC, as well as the testimony by the vocational expert ("VE"), the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, such as a photo copy machine operator, a router, an electrical assembler, and an addresser. (Tr. 38-39.) As noted in the ALJ's decision, all of these representative occupations require an exertional level of light or sedentary and a Specific Vocational Preparation ("SVP") of 2. (Tr. 38.) Thus, the ALJ found that Plaintiff had not been under a disability since July 1, 2017. (Tr. 39.)

### D. Analysis

To the extent Plaintiff argues that the ALJ erred at step two by failing to find that Plaintiff's gender dysphoric disorder was a severe impairment, or discussing it at all, this argument is unavailing. In the Eleventh Circuit, "[t]he finding of any severe impairment . . . is enough to satisfy step two because once

---

[8] Plaintiff was born in 1996 and was 22 years old on the date of the ALJ's decision and 21 years old when the SSI application was filed. (Tr. 31, 38.)

[9] The ALJ noted that Plaintiff had a limited education and was able to communicate in English. (Tr. 38.)

the ALJ proceeds beyond step two, he is required to consider the claimant's entire medical condition, including impairments the ALJ determined were not severe." *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 902 (11th Cir. Mar. 30, 2011). Therefore, even if the ALJ erred by not finding Plaintiff's gender dysphoria to be a severe impairment, the error is harmless because the ALJ found Plaintiff had other severe impairments, including a disorder of the spine, psoriasis, an ankle impairment, a seizure disorder, obesity, an affective disorder, an anxiety disorder, and a trauma-related disorder (PTSD). *See Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824-25 (11th Cir. 2010) (per curiam) ("Even if the ALJ erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that [plaintiff] had a severe impairment, and that finding is all that step two requires. . . . Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe.").

However, even if the ALJ's failure to address Plaintiff's gender dysphoria at step two constitutes a harmless error, the ALJ's failure to address this condition at all at the remaining steps of the disability evaluation process requires a remand. *See Ashford v. Barnhart*, 347 F. Supp. 2d 1189, 1193 (M.D. Ala. 2004) ("Medical opinions contained in the record confirm that Ashford has bipolar disorder . . . . However, the ALJ never analyzed the impact of Ashford's bipolar disorder on her ability to work. Indeed, he never accepted the fact that she suffers from this condition. This suggests that he did not properly consider the

14

disease when determining that her combination of impairments did not meet the equivalent of a listed impairment."); *cf. French v. Comm's of Soc. Sec.*, No. 4:12-cv-12835, 2013 WL 1703306, at *8-9 (E.D. Mich. Mar. 12, 2013) (finding that the ALJ's "alleged omission of Plaintiff's depression and/or gender identity disorder from the list of severe impairments" did not necessarily undermine the ALJ's decision where the ALJ "*properly considered Plaintiff's depression and gender identity disorder in the remaining steps of the sequential analysis*") (footnote omitted) (emphasis added).

Here, Plaintiff argues that the evidence supports a finding that his gender dysphoria disorder impacted his "ability to handle basic workplace stress, interactions with others and change." (Doc. 26 at 17.)  Defendant, on the other hand, argues that the ALJ evaluated Plaintiff's mental health complaints and that Plaintiff failed to establish he had additional limitations due to gender identity disorder.  (Doc. 27 at 7-10.)   Defendant's arguments are unpersuasive.

The record reflects that Plaintiff had a history of mental health issues and treatment from an early age.  (*See, e.g.*, Tr. 308-09 (clinical summary of discontinuation of therapeutic services from the Child Guidance Center, dated October 29, 2014, indicating that Plaintiff received treatment from October 20, 2009 until October 22, 2014; initially presented with concerns of poor school performance, frequent meltdowns as evidenced by crying and yelling, a history of Baker Act admissions for aggressive behavior towards peers, history of trauma, and pseudo-seizures and noting, *inter alia*, that Plaintiff required ongoing mental

15

health treatment and was being transferred to an adult facility as he presented with low insight and low functioning).) The record also reflects that Plaintiff was diagnosed with gender dysmorphia/sexual identity disorder. (Tr. 314 (noting, on August 14, 2015, that Plaintiff did "not like taking female hormones and/or birth control pills and wishe[d] instead to take male hormones as she feels more like a male than a female"); Tr. 329 (noting that on August 14, 2015, Plaintiff presented "for follow-up of Body Dysmorphia and PTSD and likes to be referred to as Kenji" and reported "some difficulty with outer appearance which is causing anxiety, depression, and suicidal ideations," as well as "difficulty sleeping due to preoccupations with appearance"); Tr. 332 (noting, on October 30, 2014, that Plaintiff was diagnosed with mood disorder, not otherwise specified ("NOS"), anxiety disorder NOS, and sexual development disorder NOS); Tr. 366 (noting that, on August 17, 2015, Plaintiff was referred to gynecology for reconstructive surgery and body dysmorphia); Tr. 368-70 (noting, on August 31, 2015, that Plaintiff presented for hirsutism and body dysmorphic disorder and was assessed with gender identity disorder in adolescents or adults, metabolic syndrome, and polycystic ovary syndrome ("PCOS")); Tr. 569 (noting that on June 1, 2017, Plaintiff presented to therapy with a full beard and stated "[h]e fears being transgender in north [F]lorida is dangerous"); Tr. 602 (treatment note from Plaintiff's gynecologist dated March 16, 2017, stating that Plaintiff requested "hormonal therapy for sex change [from] female to male" and had a history of PCOS, metabolic syndrome, and morbid obesity; diagnosing Plaintiff with, *inter*

16

*alia*, transsexualism; and noting that it was explained to Plaintiff that this was not the provider's area of expertise, and that in light of Plaintiff's comorbidities, he was not a good candidate for testosterone therapy); Tr. 698 (noting, on October 5, 2017, that Plaintiff's gender identity disorder symptoms were chronic and poorly controlled; he had been referred to an endocrinologist to be evaluated for gender change, but was told the endocrinologist "did not offer that kind of service[]"; and he "has Gender Identity Disorder and is wanting to start treatment medication"); Tr. 800 (emergency department note dated March 25, 2018, indicating that Plaintiff was being admitted pursuant to the Baker Act, had been brought in by the St. John's Sheriff's Office due to suicidal ideation after having taken an unknown amount of Luvox, and noting that "[Patient] identifies as male and prefers the name kengi [sic].  [Patient] says she is sick of hearing the wrong pronouns.  [Patient] also has been arguing with mother[']s [boyfriend].").)

     The undersigned notes that Plaintiff was diagnosed with gender dysphoria which may have an impact on Plaintiff's functional abilities, particularly in light of Plaintiff's inability to obtain proper treatment for this condition.  (*See, e.g.*, Tr. 427, 433, 553, 702, 860.)  "While the ALJ did not need to determine whether every alleged impairment was 'severe,' he was required to consider all impairments, regardless of severity, in conjunction with one another in performing the latter steps of the sequential evaluation."  *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014).  After reviewing the record as a whole, it is unclear whether the ALJ considered Plaintiff's gender dysphoria in

17

conducting the five-step evaluation process, including Plaintiff's RFC.  Thus, the Court is left to speculate as to whether the ALJ gave due consideration to Plaintiff's gender dysphoria, related symptomology, and purported limitations arising therefrom in determining Plaintiff's ability to engage in substantial work activities.  As the Court's function is not to engage in fact-finding or to re-weigh the evidence, a remand for further administrative proceedings is required.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the Commissioner to reevaluate the five-step process in light of Plaintiff's gender dysphoria.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE and ORDERED** in Jacksonville, Florida on November 12, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record